IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE B. VÁZQUEZ SEGARRA; CARMEN
Z. TORRES GARCIA and THE CONJUGAL
PARTNERSHIP CONSTITUTED BY BOTH

Plaintiffs,

v.                                                  CIVIL NO. 05-2347 (GAG/BJM)

PUERTO RICO TELEPHONE COMPANY
and VERIZON COMMUNICATIONS, INC.,

Defendants.

## OPINION AND ORDER

Before the court is defendant Puerto Rico Telephone Company's ("PRTC") motion for

summary judgment on plaintiffs' remaining claim under § 510 of the Employment Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1140 (Docket No. 59), plaintiffs' opposition (Docket

No. 70), and PRTC's reply (Docket No. 77).  For the reasons that follow, PRTC's motion for

summary judgment is **granted**.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(c).  A fact is material only if it "might affect the outcome of the suit under

the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining if

a material fact is "genuine," the court does not weigh the facts, but instead ascertains whether the

"evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Id.;

Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the [evidence] ... which

it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523

U.S. 574, 600 n.22 (1998), *quoting* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once this

threshold is met, the burden shifts to the nonmoving party.  The nonmovant may not rest on mere

conclusory allegations or wholesale denials.  Fed.R.Civ.P. 56(e); <u>Libertad v. Welch</u>, 53 F.3d 428,

435 (1st Cir. 1995).  Instead, the nonmoving party must "set forth specific facts showing that there

is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  Further, the nonmovant "must do more than simply

show that there is some metaphysical doubt as to the material facts."  <u>Matsuchita Elec. Indus. Co.

v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The parties must rely upon admissible evidence

to support or oppose summary judgment.  Fed.R.Civ.P. 56(e); <u>Hoffman v. Applicators Sales and

Serv., Inc.</u>, 439 F.3d 9, 14 (1st Cir. 2006).  Of course, the court draws inferences and evaluates facts

"in the light most favorable to the nonmoving party."  <u>Leary</u>, 58 F.3d at 751.

### FACTUAL BACKGROUND

The following facts, taken from the evidence on record, are presented in the light most

favorable to plaintiffs.[1]

Plaintiff José Vázquez Segarra ("Vázquez") began working at PRTC in the investigations

division of the Security Department on April 15, 1980.  (Docket No. 59-3, ¶ 2; Docket No. 72, ¶ 1).

As part of his job responsibilities, Vázquez spent significant time outside the building where his

office was located.  (Docket No. 59, Exh. 2, p. 65).  Vázquez's supervisor was Ángel Soto Tañón,

who headed the investigations division of the Security Department.  (Docket No. 59, Exh. 1, p. 62).

Vázquez typically arrived to work at around 7:00 a.m., earlier than many other employees, and had

a generally commendable employment record at the company.  (Docket No. 72, Exh. 6, p. 22-23;

---

[1]Plaintiffs' counter-statement of material facts violates Local Rule 56 by lacking specific citations
to the record in support of many of its contentions with PRTC's statement of uncontested facts.  Accordingly,
the facts contained in the counter-statement of facts will be given credit only to the extent that they are in
compliance with the local rule.  <u>See</u> <u>Cabán Hernández v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir.
2007) (holding that the district court did not abuse its discretion in failing to consider employees'
counter-statement of material facts at summary judgment stage where employees failed to comply with local
court rules for opposing a summary judgment motion by failing to, among other things, furnish specific
record citations to support their version of the facts).

Exh. 8).

PRTC sponsors a Retirement Plan for Salaried Employees ("Plan") that is approximately eighty percent funded in which Vázquez participated.  (Docket No. 59, Exh. 2, p. 77; Exh. 5, p. 70). Pursuant to the Plan, a participant's normal retirement age is the later of: (a) the 65th anniversary of his birth; or (b) the fifth anniversary of his employment commencement date.  A participant may retire early in two circumstances: either after the age of 55 years and upon completion of a period of service of at least ten years, or the day when the sum of the participant's age and period of service equals 85.  (Docket No. 59, Exh. 6, p. 90; Exh. 7; Exh. 8).  A Plan participant who is terminated is entitled to benefits under the Plan if he has completed five or more years of service and is credited with a number of years of vesting service equal to the number of whole years of his period of service for vesting purposes.  (Docket No. 59, Exh. 7, p. 45).

In 2000 and 2003, PRTC offered retirement windows whereby it increased eligible employees' pension rights so that they could leave the company with a greater pension rather than work the amount of time to gain the years of service necessary to retire with a full pension.  (Docket No. 59, Exh. 1, p. 91; Exh. 5, p. 20, 24-25).  Vázquez was not eligible to participate in these retirement windows.  (Docket No. 59, Exh. 5, p. 21). After 2003, no more retirement windows were opened since the company's attrition was occurring at a rate commensurate with its needs and because the retirement windows were expensive.  Instead, in 2004 and 2005, PRTC made available voluntary separation programs in which it offered eligible employees financial inducements and medical coverage continuation.  (Docket No. 59, Exh. 2, p. 93; Exh. 6, p. 89-93, 100-101; Exh. 9; Exh. 10).  PRTC notified eligible employees of the voluntary separation programs through general and individualized memoranda.  The individualized memoranda contained calculations indicating the amount each particular employee would receive pursuant to the offer.  These programs were opened in October 2004 and January 2005.  (Docket No. 59, Exh. 5, p. 34-37; Exh. 6, p. 98-99). Vázquez was offered the option of participating in two different voluntary separation programs and

José B. Vázquez Segarra, et al vs. PRTC                                                 **Page 4**
Civil No. 05-2347 (GAG/BJM)
Opinion and Order

accordingly was notified with the referenced individualized memoranda. (Docket No. 59, Exh. 6,

p. 99-100; Exh. 9; Exh. 10). Vázquez declined PRTC's invitation to participate in both programs.

(See Docket No. 1, ¶4.4).

In 2005, the PRTC put in effect a small involuntary separation program in order to increase

the company's efficiency. The determination as to which particular groups were to be impacted was

made by each work group's vice president. (Docket No. 59, Exh. 2, p. 94-95). The involuntary

separation program was executed by strict seniority. (Docket No. 59, Exh. 5, p. 44-48; Exh. 6, p.

107). In the investigations division, only one employee – the least senior security investigator – was

terminated pursuant to the involuntary separation program of 2005. (Docket No. 59, Exh. 5, p.

44-48; Exh. 6, p. 108-109).

PRTC  was sold by the government in March 1999.  At that time, PRTC's head count was

approximately seven thousand. By the end of 2005, the head count was down to approximately five

thousand, and by March 2007 the employee head count had reached approximately forty-six

hundred. (Docket No. 59, Exh. 2, p. 88-89). At the time of the sale, the Plan was underfunded. As

part of the sale agreement, the government was responsible for allocating some portion of money

towards the underfunded Plan. Accordingly, PRTC has developed a strategy to fully fund the Plan

by 2010, and puts $155,000,000 towards the Plan each year. (Docket No. 59, Exh. 2, p. 77, 80).

During his employment with PRTC, Vázquez received a copy of PRTC's Discipline Manual,

PRTC's Ethics Manual, and PRTC's Employee General Conduct Manual. (Docket No. 59, Exh. 11;

Exh. 12; Exh. 13). The referenced Manuals included policies which prohibit the allocation of work

time as personal time and the use of PRTC assets for personal benefit. (Docket No. 59, Exh. 11-13).

The Discipline Manual provides the permissible remedies for each individual violation of the

company's rules.  Several of the offenses provide for mandatory or optional dismissal of the

employee following a single violation of the rules, including offense numbers 30, 31, 40, 53, and 56.

(Docket No. 59, Exh. 11).

In August 2005, Jorge Sotomayor ("Sotomayor"), a member of the PRTC executive security

team, received an anonymous handwritten letter through the PRTC's internal mail stating that Vázquez was spending working hours at his and his wife's car repair shop. The letter also stated that the Security Department was aware of Vázquez's visits to his shop and requested the matter be referred to Cristina Lambert ("Lambert"), who is the President and CEO of PRTC. (Docket No. 59, Exh. 2, p. 9, 34-35; Exh. 3, p. 14; Exh. 14). Sotomayor provided Lambert with a copy of the letter on the day he received it. (Docket No. 59, Exh. 2, 35-36; Exh. 3, p. 15). Since the letter stated that the investigations division of the Security Department was aware of Vázquez's alleged wrongdoings, Lambert decided to assign the investigation of the matter to the "executive security division," which was separate and distinct from the security division in which Vázquez worked. (Docket No. 59, Exh. 2, p. 36-37). The executive security division primarily provided security to PRTC's executive team and was comprised of Carlos Hernández ("Hernández"), Rafael Guzmán, and Sotomayor. (Docket No. 59, Exh. 2, p. 19-20, 35; Exh. 4, p. 10). The investigation was conducted by Hernández and consisted of video and non-video surveillances of Vázquez's car repair shop. Said surveillances were documented in typewritten pages, which may have been transcribed from handwritten notes, with information as to Vázquez's times of arrival, Hernández's observations, and the dates and times in which the surveillances were conducted. (Docket No. 59, Exh. 2, p. 43-45; Exh. 6, p. 20; Exh. 15). Hernández and Sotomayor gave conflicting statements as to the type of vehicle Hernández used to conduct surveillance (Docket No. 72, Exh. 2, p. 29-31; Exh. 3, p. 20-21), but a letter submitted by José A. Ramos, PRTC Manager of Labor Relations and Employee Affairs, stated that Hernández was assigned two different vehicles during the time of the investigation. (Docket No. 72, Exh. 5).

The investigation showed that Vázquez spent a significant amount of working hours visiting his car shop in an official company vehicle. (Docket No. 59, Exh. 2, p. 64; Exh. 6, p. 62-63; Exh. 16, p. 51-52). Vázquez's time sheets during this time reflected the normal eight-hour work schedule with no report of taking personal time. (Docket No. 59, Exh. 2, p. 55; Exh. 17). A day prior to his termination, Vázquez was interviewed by Hernández and Soto Tañón. During the interview,

Vázquez admitted having visited his car shop on the particular dates of the investigation but denied the time involved or the intervals in which he was there. He also stated that one reason he visited his car shop with such frequency was to use the bathroom due to a urinary infection. (Docket No. 59, Exh. 1, p. 55-57; Exh. 2, p. 71-72; Exh. 18; Docket No. 72, Exh. 15).

Upon reviewing the results of the investigation and Hernández's interview of Vázquez, Lambert decided to terminate Vázquez's employment with PRTC. (Docket No. 59, Exh. 2, p. 51-56, 71-72). In making this decision, Lambert declined to follow the recommendation of PRTC's vice president for human resources, who recommended a lesser sanction. (Docket No. 59, Exh. 2, p. 57; Exh. 6, p. 78-79). Lambert's decision was influenced by the fact that Vázquez's position as an investigator made him responsible for making sure that other employees were not wasting company time and resources, the precise transgression that Vázquez himself committed. Id. at p. 53, 63. At the time of his termination on September 30, 2005, Vázquez was fifty years old and had twenty-five years at PRTC. (Docket No. 59, Exh. 19). Vázquez' termination was communicated to him through a letter dated September 30, 2005, which contained a list of violations of nine company rules: numbers 13, 15, 17, 18, 30, 31, 40, 53, and 56. (Docket No. 59, Exh. 6, p. 59; Exh. 20). In his deposition, Vázquez testified that he knew of two other PRTC employees who had been terminated in order to avoid paying them retirement benefits, but that he did not know when they were dismissed, who made the decision to dismiss them, or what factors PRTC took into account in making the decision. (Docket No. 59, Exh. 1, p. 125-29).

## DISCUSSION

Plaintiffs bring their claim under ERISA § 510. That section provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan...or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Plaintiffs, in short, contend that PRTC terminated Vázquez from his employment of twenty-five years in order to prevent him from qualifying for additional retirement benefits that

he would be entitled to if he remained employed there for five additional years.

Where, as here, there is no direct evidence of the employer's impermissible motivation, the *McConnell Douglas* burden-shifting approach is used to determine whether an employer discharged the employee in order to interfere with the receipt of benefits under ERISA. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Lehman v. Prudential Insurance Co., 74 F.3d 323 (1st Cir. 1996) (applying the *McDonnell Douglas* framework to § 510 ERISA claims).

Under that framework, the plaintiff carries the initial burden of establishing a prima facie case by presenting sufficient evidence that he: (1) is entitled to ERISA's protection; (2) was qualified for the position; and (3) was discharged under circumstances giving rise to an inference of discrimination. Barbour v. Dynamics Research Corp., 63 F.3d 32, 38 (1st Cir. 1995). "As in the Title VII context, the plaintiff's burden of proof at this stage is *de minimis*." Id. Once the plaintiff establishes a prima facie case, a presumption arises that the defendant acted unlawfully in denying ERISA benefits, and the burden shifts to the defendant to produce evidence that the adverse employment action was taken for a legitimate, non-discriminatory reason. Id. If the defendant meets its burden of production, the presumption of intent established by the plaintiff's prima facie case "drops out of the picture" and the burden shifts back to the plaintiff, who must prove that the defendant acted with the specific intent of interfering with the plaintiff's ERISA benefits. Id. at 39. In particular, the plaintiff, in order to survive a motion for summary judgment, must introduce evidence sufficient to support two findings: (1) that the employer's articulated reason was a pretext; and (2) that the true reason was to interfere with the plaintiff's receipt of benefits. Id.

In this case, PRTC argues that summary judgment must be granted for two reasons: first, that plaintiffs failed to establish a prima facie case because there is no evidence that Vázquez was discharged under circumstances giving rise to an inference of discrimination; and second, that plaintiff can point to no evidence of specific intent of interfering with plaintiff's ERISA benefits.

Regarding the prima facie case, plaintiffs aver that the timing of Vázquez's discharge – six

José B. Vázquez Segarra, et al vs. PRTC                                          **Page 8**
Civil No. 05-2347 (GAG/BJM)
Opinion and Order

to eight months[2] after he rejected the last of two invitations for voluntary separation from the company – is sufficient to give rise to an inference of discrimination.  (Docket No. 70, p. 3). Plaintiffs' theory is one of retaliation, which "occurs when (1) an employee participates in a statutorily protected activity, (2) an adverse employment action is taken against him or her, and (3) a causal connection existed between the two." Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 881 (9th Cir. 1989), *citing* McKinney v. Dole, 765 F.2d 1129, 1143 (D.C.Cir.1985).  But "[w]hile the timing of a discharge may in certain situations create the inference of reprisal [under ERISA]," Kimbro, 889 F.2d at 881; Mesnick v. General Electric Co., 950 F.2d 816, 828 (1st Cir. 1991), any such inference must be reasonable in light of the evidence.  Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 25 (1st Cir. 1998).  Accordingly, even very close temporal proximity is not always sufficient to carry a plaintiff's prima facie case.  In Kimbro, the court found that the plaintiff failed to make out a prima facie case under ERISA although he was terminated "immediately" after using his sick leave benefits.  The court reasoned that his prior use of benefits, including a longer period of absence five years prior to his dismissal, was fatal to the plaintiff's ERISA prima facie case of retaliation.  Id. at 881.  That is, the plaintiff "failed to adduce ... any evidence from which one could reasonably infer that his discharge was in reprisal for his prior use of sick leave benefits."  Id.

Here, plaintiffs rely entirely on the six- to eight-month temporal nexus between Vázquez's refusal to participate in the voluntary severance program and his dismissal, but such a connection has been held by other courts to be insufficient, by itself, to carry a plaintiff's prima facie case.  See, e.g., Rath v. Selection Research, Inc., 978 F.2d 1087, 1090 (8th Cir. 1992) (plaintiff failed to make out a prima facie case of ERISA retaliation based solely on fact "that his notice of termination came six months after [employer] reprimanded [him] for complaining about the proposed [employee stock

---

[2]Plaintiffs state in their opposition that Vázquez was terminated six months after the offer of voluntary severance, but it is uncontested that there were eight months between when the voluntary severance became available (January 2005) and when Vázquez received his termination letter (September 30, 2005).  (Docket No. 59-3, ¶ 16; Exh. 20; Docket No. 72, ¶ 1).

ownership plan] changes"); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir.1986)

("The mere fact that [plaintiff] was discharged four months after filing a discrimination claim is

insufficient to support an [inference] of retaliation").[3]   Moreover, the fact that Vázquez was

dismissed five *years* before he would have become eligible for his additional retirement benefits

makes the timing of his discharge even less likely to evince a desire by PRTC to avoid paying

Vázquez retirement plan benefits.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74

(2001) ("The cases that accept mere temporal proximity between an employer's knowledge of

protected activity and an adverse employment action as sufficient evidence of causality to establish

a prima facie case uniformly hold that the temporal proximity must be 'very close.'"); Humphreys

v. Bellaire Corp., 966 F.2d 1037, 1043-44 (6th Cir. 1992) (former employee established prima facie

case of pension discrimination by testifying that he was discharged two months before pension

vested); Dister v. Continental Group, Inc., 859 F.2d 1108, 1115 (2d Cir. 1988) (former employee

who was discharged four months before he qualified for enhanced pension benefits made out prima

facie case under § 510 of ERISA sufficient to withstand summary judgment); Hendricks v.

Edgewater Steel Co., 898 F.2d 385, 389 (3d Cir. 1990) (former employee failed to make out a prima

facie case under ERISA by showing that his employment was terminated eleven months before his

pension vested).  Accordingly, the timing of Vázquez's termination is an insufficient basis, by itself,

to give rise to an inference of discrimination.

But even if plaintiffs had made out a prima facie case, their ERISA claim would nonetheless

fail to survive summary judgement since there is no evidence of a specific intent by PRTC to

interfere with Vázquez's ERISA benefits.  Plaintiffs concede that PRTC has carried its burden of

production to put forth a non-discriminatory reason for the dismissal – the investigation of

Vázquez's repeated visits to his personal place of business during working hours at PRTC. (Docket

---

[3]Though Cooper involved a claim under Title VII, the ruling is nonetheless instructive here.  See
Dichner v. Liberty Travel, 141 F.3d 24, 30 n.5 (1st Cir. 1998) ("We regard Title VII, ADEA, ERISA, and
FLSA as standing in *pari passu* and endorse the practice of treating judicial precedents interpreting one
statute as instructive in decisions involving another."), *quoting* Serapion v. Martínez, 119 F.3d 982, 985 (1st
1997).

No. 70, p. 3).  Thus, the burden shifts back to plaintiffs to show that the employer's articulated reason was a pretext and that the true reason was to interfere with the plaintiff's receipt of benefits. Barbour, 63 F.3d at 39.  Importantly, "no ERISA cause of action will lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment."  Id. at 37.

Plaintiffs point to "numerous weaknesses, inconsistencies, implausibilities, incoherencies and contradictions" regarding the investigation, Vázquez's employment record, and the procedures for terminating Vázquez.  (Docket No. 70, p. 4-8).  However, none of these alleged weaknesses in PRTC's position suffices to support an inference that PRTC's motivation was to interfere with Vázquez's receipt of benefits.  Discrepancies regarding the precise automobile used by Hernández during the investigation, the individual who made the decision as to which dates video footage would be taken, and the manner in which notes were taken are not indicative of discrimination with regard to Vázquez's pension benefits.   Plaintiffs also fail to demonstrate how testimony regarding Vázquez's work performance has any bearing on whether he violated the company rule disallowing employees to hide facts, distort data, or make false declarations as to facts or incidents related to the company or its employees.  See Id.  Moreover, evidence of a commendable employment record adds very little to the averment that the specific reason given for the termination – the investigation – was propagated for the purpose of interfering with Vázquez's receipt of benefits.[4]

Plaintiffs' remaining arguments are likewise insufficient to carry their burden.  The averment that two similarly situated employees were terminated in order to avoid paying them retirement benefits lacks any factual underpinning.  Vázquez testified that he did not know when they were terminated, who made the decision, or what factors were taken into account.  (Docket No. 59, Exh. 1, p. 125-29).  No reasonable factfinder could find that Vázquez's employment was terminated for the purpose of interfering with his pension benefits based on such bare bones allegations.  In

---

[4] The fact that PRTC's 2005 involuntary separation program resulted in the dismissal of only the *least* senior security investigator also is inconsistent with the alleged motivation of PRTC to terminate Vázquez's employment for the purpose of interfering with his receipt of pension benefits.

José B. Vázquez Segarra, et al vs. PRTC                                      **Page 11**
Civil No. 05-2347 (GAG/BJM)
Opinion and Order

addition, plaintiffs' argument that "none of the other alleged violations averred in the termination

letter carried termination as the punishment for the first offense as per [the employment manual]"

is flat wrong.  Of the nine offenses charged, five allow for termination of employment as a remedy

for first offenses – offense numbers 30, 31, 40, 53, and 56.  Id.; (Docket No. 59, Exh. 11).

Accordingly, plaintiffs' averment that PRTC failed to follow its own procedures is unsupported.

        Finally, plaintiffs err in stating their burden at this stage.  Plaintiffs claim that they "must

only 'produce evidence from which a rational factfinder could infer that the company lied' about its

proffered reasons for his dismissal."  (Docket No. 70, p. 7), *citing* Shager v. Upjohn Co., 913 F.2d

398, 401 (7th Cir. 1990).  But First Circuit precedent clearly states that plaintiffs must produce

evidence from which a reasonable factfinder could determine not only that the reason the company

gave for the dismissal was a pretext, but also that the true reason for the termination "was to interfere

with the plaintiff's receipt of benefits."  Barbour, 63 F.3d at 39.  Plaintiffs' claim cannot survive

summary judgment by merely raising an issue of fact as to the first issue without doing so as to the

second one.   Thus, plaintiffs have failed to carry their burden and the ERISA claim, and PRTC's

motion is granted.

                                        **CONCLUSION**

        In view of the foregoing, PRTC's motion for summary judgment is **GRANTED**.  (Docket

No. 59).  Accordingly, plaintiffs' claim under ERISA § 510 is **DISMISSED with prejudice.**

        Judgment to be entered accordingly.

        **IT IS SO ORDERED.**

        In San Juan, Puerto Rico, this 11th  day of April of 2008.


                                        S/Bruce J. McGiverin
                                        BRUCE J. McGIVERIN
                                        United States Magistrate Judge